# COURT OF APPEALS.

THE PEOPLE *ex rel.* MOSES M. SMITH and MOSES M. SMITH, appellants agt. DIODATE PEASE, respondent.

In proceedings upon *quo warranto* to try the title to an elective *public office*, the parties interested have a right to go back of the *ballot box* and inquire into the *legal qualifications of the voters* who voted for the office; and in case any such voters were disqualified by a want of residence for *four months in the county*; or were *minors*; or were *aliens*, their votes are to be *discarded* where it will change the result of the election. And *hearsay evidence* of such disqualification may be received to establish it, as well as the oath of the voter himself.

*March Term,* 1863.

THIS is an action in the nature of a *quo warranto*, to test the title of the relator and the defendant to the office of county treasurer of the county of Lewis. Both parties

claim to have been legally and duly elected to that office at the general election held in that county in the month of November, 1857. It appears that at such election, three thousand and four hundred votes were cast for such officer, and that by the canvass and estimate, as made by the board of county canvassers, sixteen hundred and eighty-three votes were given to this relator, and sixteen hundred and ninety-four were given to this defendant; and to the latter the county canvassers issued the certificate of election authorized by the statute. Twenty-three imperfect votes were returned by the town inspectors, which were rejected by the board of county canvassers, of which the relator claimed nineteen, and the defendant four. The complaint claimed that these nineteen votes should be allowed to the relator, and that he had been duly and legally elected by the greatest number of votes cast at such election, and that the defendant had intruded into and usurped said office. The answer sets up that the defendant had been legally and duly elected to said office, he having received the greatest number of votes cast by qualified electors at such election; and upon the trial, the main question of controversy was, whether the defendant could show that votes cast for the relator were so given by persons not possessing the legal qualifications of voters. Conceding that the imperfect votes should be allowed to the relator and the defendant respectively as claimed by them, the result then would be that the relator would have received seventeen hundred and two votes, and the defendant sixteen hundred and ninety-eight votes, thus electing the relator by a majority of four votes.

To overcome this majority the defendant sought to establish, on the trial, that five of the votes thus claimed by and counted for the relator, were given by persons not qualified or legally entitled to vote, and deducting the same. from the said seventeen hundred and two votes, it would leave for the relator sixteen hundred and ninety-

seven votes, being one less than those given for the defendant, and consequently giving to him the greatest number of votes. On the trial, it appeared that one John Kent, who had voted for the relator, had not been a resident of the county of Lewis for four months preceding the election, and that John Thrall, who also voted for the relator, was a minor at the time he gave such vote. It also appeared that Francis Stoppel Sebastian Hock, and Conrad Hock, who also voted for the relator at said election, were aliens at the time such votes were given. And the judge charged the jury that they must inquire, upon the evidence, not which candidate had the most votes, but which had the most lawful votes, and that they must strike out and disallow all votes which they were satisfied, upon the evidence, were given by men who had not the lawful right to vote; and to this charge the plaintiff's counsel excepted. The jury found a verdict for the defendant, and judgment thereupon was given in his favor, and which, on appeal, was affirmed at the general term. The relator now appeals to this court.

J. F. STARBUCK, *for appellant*.
F. KERNAN, *for respondent*.

DAVIES, J. The charge of the judge at the trial, and the exception taken by the relator, present the main question in controversy in this action, and the only one of importance demanding consideration. It is certainly a question far-reaching in the results which must follow its determination; for, upon its just decision must depend the value and purity of the elective franchise. When we reflect that, under the present constitutional provisions in this state, we not only elect all legislative officers, but most of our judicial, executive and administrative, it cannot fail to be seen how vital it is to the success and permanency of our institutions that the voice and will, thus

,expressed, be that of those constitutionally qualified thus to speak.

It is of but little moment that constitutional qualifications, as preliminary to the exercise of the elective franchise, are prescribed, and that those thus entitled exercise that right inestimable to freemen, if persons having no such qualifications may exercise the same right, and thus thwart and subvert the will of the legal voters. Such, certainly, could never have been the intent of the framers of our system of government, and such results, it has not been heretofore supposed, were to be anticipated from an elective system.

By section fifth of article first of the constitution of the United States, each house is declared to be the judge of the election returns and qualifications of its own members. A similar provision, as applicable to our state legislature, is found in the constitution of this state, (*sec.* 10, *art.* 3;) and a like provision in most if not all of the charters of the various municipal corporations of this state will be found, as applicable to the election of the members of the common councils thereof.

So far as I have been able to discover, the rule is universal in all legislative bodies, upon inquiries as to the election of members thereof, to scrutinize the qualifications of the voters, and to deduct or disallow all votes cast for any candidate by non-qualified voters. This rule seems to be well established in such cases, and it is not perceived that any substantial reason can be suggested why a different rule should obtain in a civil suit or proceeding to determine the right of an individual to a particular office. This rule was distinctly recognized and affirmed by the house of representatives, in the election case of Vallandigham and Campbell. (*Cong. Globe, vol.* 41, *p.* 2317, *and following.*) In the extended debate had upon that case, all the members concede that the votes of illegal or non-qualified electors must be deducted or disallowed, and the

main point of difference in the discussion was as to the manner of establishing such disqualification. It was contended by some members that it could only be shown by the oath of the voter himself; while others maintained that hearsay evidence of such disqualification was admissible. Numerous precedents are cited on page 2320, which fully sanction the doctrine that hearsay evidence can be received. At page 2319 a case is cited, where, before the election committee of the house of commons, in England, Mr. Maule objected that the declarations of one John Morlan were not evidence against the sitting member. Mr. ——, since Lord ——, now Lord Chelmsford, in reply said : " In the Southampton case it was held that evidence may be given of the declarations of a person, even after voting, though it may tend to affect him with penal consequences. In the Ripon case the voter had stated to two persons, in the months of June and July, 1832, that he had no vote, and that his aunt was tenant of the house. The election took place in the beginning of 1833, and the declarations were held admissible. A voter who has voted for the sitting member is always considered as a party, and it is on that ground that his declarations are admissible. The question is always considered to be between the voter and the party questioning his vote, and not merely between the sitting member and the petitioner." The committee resolved that the evidence should be received.

The constitution of this state declares who may exercise the elective franchise. Those entitled to vote at any election are, every male citizen of the age of twenty-one years, who shall have been a citizen for ten days, and an inhabitant of this state for one year next preceding any election, and for the last four months a resident of the county where he may offer his vote. (Sec. 1 of art. 2.) It follows that none others than those possessing these qualifications can lawfully vote.

All votes are to be ballots, and offered to the inspectors

of election on the day of the election; and it is made by statute the duty of each inspector to challenge every person offering to vote whom he shall know or suspect not to be duly qualified as an elector, (1 *R. S.*, 5th ed., 433, § 36;) and sec. 41, same page, declares that in case any inspector of election shall knowingly and willfully permit or suffer any person to vote at any election who is not entitled to vote thereat, the said inspector so offending is to be adjudged guilty of a misdemeanor.

If a person offering to vote is challenged, it is made the duty of the inspectors to administer to the voter the preliminary oath prescribed by the statute, and to put such questions to the voter as may tend to show his right to vote; and if any person shall refuse to take such preliminary oath, or to answer fully any questions which shall be put to him, his vote shall be rejected. (1 *R. S.*, 5th ed., p. 430, §§ 18, 19, 20.) If the person offering to vote shall persist in his claim to vote after the inspectors shall have pointed out to him wherein his right to vote shall appear to them deficient, the inspectors shall then, if the challenge is not withdrawn, administer the general oath set forth in the statute. If the oath is refused to be taken, the vote is rejected. (*Id.*, pp. 430, 431, §§ 21, 22, 24.)

It is seen, therefore, that the inspectors have no authority by statute to reject a vote, except in the three cases of a refusal to take the preliminary oath, or fully to answer any question, or on refusal to take the general oath; and the only judicial discretion vested in them is, to determine whether any question put to the person offering to vote has or has not been fully answered. If the question put has been fully answered, and such answers disclose the fact that the person offering to vote is not a qualified voter, yet if he persists in his claim to vote, it is imperative upon the inspectors to administer to him the general oath, and, if taken, to receive the vote and deposit the same in the ballot-box. These are all the safeguards the legislature

have thought proper to provide to insure the prevention of fraudulent or illegal voting, and they leave but little discretion to the inspectors. Their duties, except in the single instance adverted to, are simply ministerial in the reception of the votes, and entirely so in counting and making returns thereof. The legislature have left to those bodies having the power to judge of the returns and elections of their own members, to correct any abuses which may have resulted in such election; and to judicial investigation, when the legal rights of individuals are concerned or affected, to apply such remedies as the nature of the case calls for.

An action is provided by law, in the nature of a *quo warranto*, to determine, as well the question of the usurpation of the person in office, as the claims of the person asserting his right thereto. In this action the determination as well disposes of the public interest as the private right. It is not of so much importance, so far as the public is concerned, which of two claimants shall discharge the duties of an office; but the private right of an individual to the fees and emoluments of an office are properly and legitimately the subjects of judicial cognizance; and to adjudicate upon this right, it becomes essential to determine who was legally and duly elected or appointed to it, and who entitled to discharge its duties and receive and enjoy its fees and emoluments. The provisions of the Code in reference to this action are ample to cover and secure, as well the interests of the public as the private rights of the parties. The determination of those rights necessarily leads to an investigation into the title of the claimants to the particular office, and such investigation must result in a determination of the legality of the election or appointment of the one or of the other.

It is made the duty of the board of county canvassers, upon the statement of votes given, to determine what person, by the greatest number of votes, has been duly

elected to any office mentioned in said statement. (1 *R. S.*, *5th ed.*, *p.* 438, § 10.) County treasurers of the several counties of this state are to be elected at a general election, and hold their office for three years, (*id.*, *p.* 406, § 17;) and the certificate of the board of canvassers authorized to canvass the votes given for any elective office is made evidence of the election of the person therein declared to have been elected. (*Id.*, *p.* 410, § 22.) But such certificate is only *prima facie* evidence of the title of the person receiving it to the office therein mentioned. In all cases where the proceeding is by *quo warranto*, or in an action of that nature, it is held that such proceeding is instituted to try the right to the office directly, and it is competent to go behind the certificate, which would otherwise be conclusive, to ascertain the real facts of the case. (*The People* agt. *Seaman*, 5 *Denio*, 409; *People* agt. *Ferguson*, 8 *Cow.*, 102; *People* agt. *Van Slyck*, 4 *Cow.*, 297; *People* agt. *Vail*, 20 *Wend.*, 12.)

In this last case, BRONSON, J., says: " Such proceeding reaches beyond those evidences of title which are conclusive for every other purpose, and inquires into and ascertains the abstract question of right." He also says: " In those legislative bodies which have the power to judge of their own members, it is the settled practice, where the right of the sitting member is called in question, to look beyond the certificate of the returning officer; and I think a court and jury, with better means of arriving at truth, may pursue the same course." But while it is conceded that this proceeding is to ascertain the right of the person to the particular office, and that by means of it any negligence, mistake or fraud of the inspectors or canvassers may be corrected in their proceedings, yet it is contended, if the inspectors have received and allowed votes to a party given by persons not qualified to vote, such proceeding is final and conclusive, and the party thereby defrauded of an office to which he was duly elected by

People *ex rel.* Smith agt. Pease.

having received the greatest number of legal and qualified votes, has no remedy, but must submit as well to the loss of the office as to the fees and emoluments growing out of it. I cannot assent to such a proposition. What is it that confers title to the office and the legal right to the reception of its emoluments ? It surely is the fact that the greatest number of qualified voters have so declared their wishes at an election held pursuant to law. It is not the canvass, or estimate, or certificate which determines the right. These are only evidences of the right, but the truth may be inquired into and the very right be ascertained. When it is so ascertained, the legal consequences follow, that the person usurping the office is ousted; the person entitled takes the office and its fees, &c., and recovers from the usurper the fees or emoluments belonging to the office, received by him by means of his usurpation thereof.

If the term of the office shall have expired before the final decision of the question, it follows that the successful party cannot take the office ; but he will be none the less entitled to recover the fees and emoluments to which he was legally entitled, which may have been received by the usurping claimant. Now, can a person be deprived of these fees, &c., by the votes of persons not qualified to cast them ? It would seem that the statement of the proposition furnished its own answer. The constitution prescribes who may vote, and it is needless to say that none others lawfully can do so. But if, through inadvertence, fraud or mistake, the votes of persons having no right so to vote are taken and counted for a particular candidate, and he is therefore by reason of counting and allowing such votes to him declared duly elected to a given office, and enters upon the discharge of its duties and receives the fees and emoluments pertaining thereto, can he interpose such illegal votes to the claim of the person rightfully elected by the greatest number of legal and qualified

voters? Can he make title to the office by the votes of those who have no legal or constitutional right to vote—in other words, by the wishes of those not voters? In my opinion, clearly not. The very right to the office is determined by the fact, to whom was the greatest number of legal and duly qualified votes given? For, suppose that instead of the voting having been by ballot, it had been *viva voce,* and the relator had 1702 persons declaring for him for county treasurer, and the defendant 1698, and of those declaring for the relator it conclusively appeared on the trial that fifteen or twenty of these thus declaring for him were women, minors or aliens, and thus not voters, and that all those declaring for the defendant possessed the legal qualifications of voters, could there be a moment's doubt as to which was legally entitled to the office? I do not see that there could; and the supposed case is in substance that now under consideration. How can those who have no legal right to interfere with or be heard at an election deprive the legal and qualified voters of their legitimate choice, or the person duly elected by them to an office, of its emoluments and advantages? A vote is but the expression of the will of a voter, and whether the formula to give expression to such will be by ballot or *viva voce,* the result is the same; both are a vote. It is a paradox to say that a vote can be given by one not a voter; and as it is the greatest number of votes which elects a candidate and gives title to the office, it follows logically that those ballots given or handed in by persons not voters, are not votes, and cannot therefore be rightfully estimated or have any influence upon the result. Ordinarily there would be great difficulty in separating or ascertaining which ballots are legal, and which have no validity whatever, as being given by non-voters. But in the case at bar, it is clearly ascertained that five ballots or votes given and counted for the relator were cast or given by persons not qualified to vote, and he consequently, in

truth and in fact, had five votes less than have been counted and allowed to him. They must therefore be subtracted from the total vote allowed to him, and such subtraction leaves him a less number of votes than were given for the defendant.

In the case of the *People* agt. *Van. Slyck*, (*supra*,) Jones, *arguendo*, says: "To make a choice of the defendant within the provisions of the statute, there should be a majority of legal votes;" and such seems, evidently, to be the view of the court. It hardly needs argument or illustration to show that the votes contemplated by the framers of the constitution, and by the legislature in declaring that the person having the greatest number of votes should be elected and entitled to the particular office, meant thereby legal votes—those, and those only, cast by voters possessing the constitutional qualifications. In my opinion, ballots cast by females, minors, aliens, or those not having the constitutional qualifications, are not votes within the meaning and intent of the constitution and election laws. Cole on *Quo Warranto*, (*p.* 110,) citing a number of English cases, lays down these propositions, which harmonize with the views already suggested. He says that the party may not have been duly elected. This may happen, although he was "qualified" to be elected, and the election itself was neither void nor irregular, as when he did not obtain a majority of legal votes. The burgess roll is *prima facie* evidence of a party's right to vote as a burgess at an election. Indeed, no question can be put to him as to his right to vote, but only to his signature to the voting paper handed in by him, and his identity with the person named in the burgess roll, and whether he has already voted at that election. But the burgess roll is not conclusive as to the voter's title upon an application for a *quo warranto* information against the party elected, and therefore the relator may show by affidavit that although the defendant had a colorable majority at the election, yet that certain

of his votes were bad ones for specified reasons, and that, deducting such bad votes, the relator or some other candidate had the majority of legal votes. So it may be shown that some of the voting papers for the defendant were defective and insufficient, and that, deducting them, the defendant had not a majority of legal votes. The same doctrine was enunciated in the case of *Rex* agt. *Vice-Chancellor, &c., of Cambridge,* (3 *Bin.*, 1647,) where a mandamus was awarded to put the Earl of Hardwicke into the office of high steward of the university of Cambridge, on the ground that one of the votes given against him, which produced a tie, was an illegal vote, and by a person not having the right to vote. The proctors had declared the vote to be equal, and therefore no election. Lord MANSFIELD, after discussing the qualifications of Mr. Pitt, whose vote had been given against the Earl of Hardwicke, and thereby produced a tie, arrived at the conclusion that he was not a legal voter, and if so, he says, there is a majority of one for Lord Hardwicke, unless the other side can disqualify some of those who voted for him. He further says: "The declaration of the proctors cannot affect the substantial right. The right of election appears to be in Lord Hardwicke, and I am very clear that the foundation of the rule should be in the election." Justice WILMOT said: "As to the declaration of the proctors, I think it immaterial; for the question depends not upon that, but upon the real majority of legal votes. Their declaration cannot alter or affect that. If they had made a declaration, and even if such their declaration had been contrary to the truth of the fair and real right, the court must have taken up the matter upon the true and real merits; for the right to the office attached in Lord Hardwicke upon his having a majority of legal votes. If he had a real right, this court ought to give activity to it; and the omission of a declaration of the proctors, or the falsity of it, cannot affect their judgment concerning the legality of the right."

Thereupon he adds: "Lord Hardwicke had the majority of legal votes."

We have seen, from the authorities and cases cited, that the practice is universal, where a scrutiny is instituted to determine the right to an office by legislative bodies, to reject all votes given or cast by persons not duly qualified to vote; and upon such investigations the declarations of the person casting the vote have been admitted and received as evidence of his qualifications or want of qualifications. It is hearsay evidence, and yet, upon well settled and uniform practice, has been allowed. The learned note to *3d McCord's Reports*, (*p.* 230,) on hearsay evidence, distinctly announces this doctrine. He says, under the 23d head: "The declarations of a voter may be given in evidence to set aside the election: as to diminish the poll by taking an incompetent vote off, or to prove bribery, &c.; but they are not admissible on a charge against the candidate for bribery, &c. They are admitted to annul votes, but not to set aside the election by *disqualifying* the member on account of his bribery, &c." (*Citing the case of Milborne, part* 1 *Doug. Election Cases,* 67; *case Ireelchester,* 3 *id.,* 76; *Petersfield case,* 3 *id.,* 6; *Worcester's case,* 3 *id.,* 129; *Shaftesbury's case,* 3 *id.,* 150.) This doctrine is referred to with approbation in *Cowen & Hill's Notes*, (*vol.* 2, *p.* 322;) and the learned note in *3d McCord* is referred to as the source from which the editor had obtained the remarks and references quoted by him. These writers and the cases cited by them distinctly recognize the doctrine that, upon a scrutiny had in reference to the validity of an election, the votes given by unqualified voters may be deducted to diminish the poll by being taken off as incompetent, and that votes so given may be annulled or disregarded or rejected.

In the case as above, the disqualification was proven by the voter himself; but these authorities abundantly sustain the position that the declarations of the voter as to his

want of qualification would have been admissible and legal evidence.

It is urged, however, that the act of the inspectors, in receiving and depositing the ballot, is judicial, and therefore cannot be reviewed in this action. It is supposed that the contrary has been satisfactorily shown, and that the universal practice of the courts, in actions or proceedings like the present, where they have inquired into the very right of the case, refutes this assumption. In the case of *The People* agt. *Van Slyck*, (*supra*,) it was urged by the counsel for the defendant that the certificate of the determination of the board of canvassers was conclusive evidence of the election; that it could neither be impeached nor contradicted; that the authority exercised by the board of canvassers was judicial; and that if the supreme court had jurisdiction to review the determination of the board of canvassers, their reviewing power could only be exercised through the medium of a *certiorari*, and, until reversed in this form, it remains valid and conclusive, and cannot be questioned by an information in the nature of a *quo warranto*. These views were repudiated by the court in that case, which held that the act of the canvassers was not judicial, but merely ministerial, and that the trial in *quo warranto* is had upon the right of the party holding the office. This doctrine was promulgated, nearly forty years since, in this state, and has, so far as I can ascertain, been acquiesced in and sustained in all cases, and I think it ought not now to be disturbed. In *The People* agt. *Ferguson*, (*supra*,) it was urged that the court could not go behind the ballot-boxes; that such a principle would be of the most dangerous tendency. Chief Justice SAVAGE most correctly said, that the object of an election is, that the person receiving the greatest number of votes in his favor shall have the office designated by the electors; that he could not assent to the proposition that you may not look beyond the ballot-boxes for testimony because of the danger of

perjury and subornation of perjury. He considered the question fairly before a jury, and to be proved, like all other facts, by the best evidence that the nature of the case admits of.

We are much pressed with the argument, that it would be attended with great inconvenience, if we permit a party to try his right to an office by showing that his adversary failed to receive a greater number of illegal votes than the ascertained majority given him. It is said that in a general state election, the time necessarily occupied in such a trial might consume more than eighty-three years. It is the first time I have ever heard it urged that a party who had a conceded right should not have a remedy to enforce it, because a large consumption of time would ensue before his right could be established. If a party has a legal title to an office, it surely can be no legal reason for denying him the opportunity to establish it, that such process will require the examination of a large number of witnesses and much time in the proceeding. Rights of parties cannot be determined on such a basis. The case of *Rex* agt. *Cambridge* only required the examination into the qualifications of one voter, and it was entertained by the court of King's Bench, but not for that reason. *Ex parte, Murphy* (7 *Cow.*, 153) involved an inquiry as to two illegal votes, and it clearly would have been entertained if it had influenced the result of the election. The case of *The People* agt. *Cooke* (14 *Barb.*, 259 ; *S. C.*, 4 *Seld.*, 67) involved an inquiry into the title of the contestants to the office of state treasurer, who had been voted for at a general state election. I do not find it was urged in that case, that the action ought not to be entertained on the ground of inconvenience or the great length of time which was occupied in the investigation. The views expressed by Judge WILLARD, in this court, in the case of *The People* agt. *Cooke*, (*supra*,) are sound, and should be adhered to. He says: " We are not called upon to say that every possible question arising

under the election law may be corrected in this way.    It
is enough that the principle maintained in *The People* agt.
*Ferguson* sustains the ruling of the court below.    That case
has stood the scrutiny of more than a quarter of a century,
and has neither been disturbed by the new constitution nor
the repeated revision of the election laws.    I see nothing
in the present case that requires us to depart from it."    He
adds, and what he says is as applicable to the present case
as the one then under consideration : "Nor is there any
danger to be apprehended to the security of our institu-
tions by pursuing this practice.    The right to an office is
no higher than a right to life, liberty and property.    There
is no principle that should withdraw the first from the cog-
nizance of a court and jury to the exclusion of the last.
Both will indeed be safe under the administration of the
ordinary tribunals."    We think, therefore, the charge of
the judge at the circuit, that it was to be determined upon
the evidence adduced which candidate had the most lawful
votes, and if they found that the defendant had the greatest
number of legal votes, then he was entitled to the office,
and their verdict should be in his favor, was correct, and
that the verdict on that ground should not be disturbed.
The motion to strike out the testimony of Conrad Hock
was properly denied.    It was for the jury to say, from the
whole testimony, whether in fact his vote should be given
to the relator.    He stated unequivocally that he voted for
Smith ; and on cross-examination he testified that it was
said Smith's name was on the ticket ; that was all he knew
about it.    It was for the jury to say, from all the circum-
stances related by him, whether or not he voted for the
relator.    We are to assume that they believed he did.    The
objection taken to the refusal of the motion to strike out
the testimony of Sheat cannot be sustained.    The witness
had testified that he did not know whether he voted or not
for Smith, and the other matters stated by him may be

People *ex rel.* Smith agt. Pease.

regarded as wholly immaterial. The other exceptions do not seem to call for any further observation.

It seems to us that the judge was correct in stating to the jury that when it was proven that a man was alien born, and there was *prima facie* proof that he had never been naturalized or otherwise become a citizen, the vote given by him must be stricken out, and the burden of proving citizenship was either upon the voter or the party claiming his vote to be legal. If the views herein expressed are sound, then this charge was unexceptionable. So was that part of the charge correct in relation to the witness Risenot, who testified that he was born in France, and had voted; and there was no evidence tending to show that he had ever been naturalized. The judge in that case charged that the legal presumption was that he had been naturalized. No suggestion was made or evidence given, when the witness was on the stand, that he had not been naturalized. He had voted, and the presumption was that he had voted legally. It was not for the court to say, as matter of law, that the vote was illegal. On this state of facts the presumption was that he was a legal voter, not that he had committed a crime. On the same ground the court might have been asked if he had stated that he was native born; that his vote be excluded because it was not proven he had attained the age of twenty-one years. The legal presumption would be that he had legally exercised the privilege of voting, until some fact appeared which would raise a contrary presumption.

The judgment appealed from should be affirmed, with costs.

Judges SELDEN, EMOTT, ROSEKRANS and BALCOM concurred in this opinion, and Judge DENIO read an opinion for reversal, in which Judges WRIGHT and MARVIN concurred.